**Cite as: Opinion No. 00-021  (August 30, 2000)**
**(unpublished)**

COUNTIES ) COMMUNITY COLLEGES ) HARFORD COUNTY
REMAINS OWNER OF ACADEMIC BUILDING AT HEAT CENTER
BECAUSE PURPORTED CONVEYANCE TO HARFORD
COMMUNITY COLLEGE WAS NOT EFFECTIVE

August 30, 2000

*The Honorable Barry Glassman*
*Maryland Delegate*

You have requested our opinion concerning ownership of the academic building at the Higher Education Applied Technology (HEAT) Center in Harford County. Specifically, you have asked whether Harford County ("the County") retains its ownership of the building or whether its interest has been conveyed to the Harford Community College ("the Community College" or "HCC").

For reasons detailed below, it is our opinion that the County owns the academic building.

# I

## Background

The HEAT Center is located on 152 acres in Harford County west of the City of Aberdeen. The academic facility at the HEAT Center is to provide "expanded educational opportunities for the citizens of northeastern Maryland through partnership agreements with a variety of public and private colleges and universities to provide a smooth transition from associate to baccalaureate and graduate degree programs" and to serve as "a regional center for corporate training and professional development." Department of General Services Action Agenda Item 39-CGI, Board of Public Works ("BPW") Minutes ( June 11, 1997).

We have been provided with several documents that underlie the development of the academic building at the HEAT Center and purport to outline the interests, rights, and obligations of various government agencies involved in the Center.

*State Bond Bill and Grant Agreement*

In 1990, the General Assembly enacted a State bond bill to provide a $750,000 grant to the County Executive and County Council of Harford County for site preparation, construction, and equipping of a higher education facility in the County. *See* Chapter 646, Laws of Maryland 1990. As a condition of the grant, the County was to provide funds for the project at least equal to the State grant. *Id.* The County Executive subsequently executed a Board of Public Works "Capital Projects Grant Agreement" which specified the use of grant funds and prohibited the transfer of "any real or personal property ... acquired with grant funds without the prior written consent of the BPW." BPW Capital Projects Grant Agreement, p.3.[1]

*Equity Agreement Between County and Transportation Authority*

In 1991, the County approached the Maryland Transportation Authority about the possibility of purchasing Transportation Authority property near the intersection of Interstate 95 and Maryland Route 22 in Harford County as the site for the HEAT Center. The Transportation Authority declined to sell that property but proposed an "equity partnership"

---

[1]In particular, Article IV, §1 of the Grant Agreement stated:

> The Grantee may not sell, lease, exchange, give away, or otherwise transfer or dispose of real or personal property, or any part of or interest in real or personal property, acquired with Grant funds without the prior written consent of the BPW. This includes transfer or disposition to a successor on the merger, dissolution, or other termination of the existence of the Grantee. The Grantee shall give BPW written notice at least 30 calendar days before any proposed transfer or disposition. Any proceeds from a permitted transfer or disposition shall be applied to repay to the State that percentage of the portion of the Grant allocable to the particular real or personal property transferred or disposed of, all as determined by BPW in its discretion.

In addition, Article IV, Section 9, stated that "[t]he Grantee may not sell, transfer, or otherwise assign any of its obligations under this Agreement, or its rights, title, or interest in this Agreement without the prior written consent of BPW."

arrangement with the County. The County agreed to the proposal, but it took nearly two years for the arrangement to be embodied in an "Equity Agreement."

Under the Equity Agreement, dated June 18, 1993, the Transportation Authority granted and assigned to the County "development rights" to the "Higher Educational development parcel ... subject to the terms and conditions set forth in this Agreement." Equity Agreement at p. 2. The Transportation Authority retained fee ownership of the entire tract. *Id*. The agreement stated that "[i]t is the intent of the parties that Harford County have full control over and use of the Higher Education development parcel ... for the purposes of development of the Higher Education facility." *Id.* Harford County was also to have "the full benefit of any lease, rental, or other income derived from the development of [the parcel]." *Id*. at p. 3. Under the agreement, the Transportation Authority would "market the remainder of the HEAT Center for additional development" and would be entitled to any income generated by that development. *Id.* The Transportation Authority and the County also agreed to execute further instruments and assurances, as necessary, including a "Memorandum of Understanding." *Id.*

*"April 1993" Memorandum of Understanding*

A Memorandum of Understanding, with a typewritten date of April 1993 but apparently executed later,[2] was signed by representatives of the Transportation Authority, the County, and HCC, as well as the City of Aberdeen and Cecil Community College. That document recited that the parties had formed a "Working Group" to facilitate the HEAT Center and specified various duties with respect to development of the project. Memorandum of Understanding at p. 2. The Working Group was to provide liaison services, expertise and advice to the developer, and "resources to the project." *Id*. The Memorandum assigned other specific duties to the City of Aberdeen, the Transportation Authority, and the County. *Id.* at pp. 2-3. Harford County's responsibilities included the selection of a developer, financing of construction, and administration of the higher education facility in consultation with Cecil County. *Id*. at p. 3. The Memorandum also incorporated by reference the Equity Agreement between the Transportation Authority and the Harford County. *Id.* at p. 2. The Memorandum of Understanding did not prescribe specific duties for HCC, but simply identified it as a member of the Working Group and recited that the two community colleges were "interested in providing technical assistance as well as general coordination of the higher education opportunity at the HEAT Center." *Id*. at p. 1.

---

[2]The signature of an Assistant Attorney General approving the document for form and legal sufficiency is accompanied by the handwritten date "9 July 1993." The Memorandum of Understanding itself recites that it was to be executed the same date as the Equity Agreement, on which a typewritten date of April 1993 was crossed out and the date "June 18" was added by hand.

*November 1993 Letter*

In a one-page letter to the Harford Community College President dated November 9, 1993, the Harford County Executive wrote that "[t]his letter serves as a commitment from Harford County regarding the use of the academic building" at the HEAT Center. The letter stated that the academic building at the HEAT Center "is permanently assigned to Harford Community College" and referenced the April 1993 Memorandum of Understanding as to the planning and development of the building. The letter stated that "[t]his assignment does not include ownership of the land but establishes rights to the parcel without fees or attachments that convey constructive use of the parcel so long as the mission of HEAT as specified in the April 1993 Memorandum of Understanding is being carried forward." The letter also stated that "[t]he initial building to be constructed on the academic parcel ... is to be *owned* by Harford Community College for the purpose of carrying out the mission of HEAT as specified in the April 1993 Memorandum of Understanding" (emphasis added). Finally, the letter designated HCC as the "broker" for all higher education programs offered at the facility.[3]

*Construction and Conflict*

The academic facility at the HEAT Center, which was built with State and County funds,[4] opened in the fall of 1995 with Harford Community College operating the academic building. Subsequently, a dispute arose between HCC and the County over the operation of the facility. The dispute became so severe that, in the fall of 1998, the County Attorney wrote to HCC's counsel, declared HCC in breach of its commitments, and threatened to "proceed with appropriate actions." *See* Letter of Ernest A. Crofoot, Esquire, to Donald E. Brand, Esquire (October 29, 1998). HCC did not respond to the substantive assertions in

---

[3]The language in that letter had apparently been derived almost verbatim from a draft "Memorandum of Understanding" between HCC and the County, dated August 1993, that had not been executed by either HCC or the County.

[4] On August 10, 1994, the Board of Public Works approved a State design and construction allocation of $750,000 to the Harford County Executive and County Council for Phase I of the HEAT Center. BPW Minutes (August 10, 1994).

On June 11, 1997, the Board of Public Works, pursuant to Chapter 131, Laws of 1995, and Annotated Code of Maryland, Education Article, §11-105(i), approved a State allocation in the amount of $891,450 for design and construction of an addition to the academic building at the HEAT Center. According to BPW documents, the grant was made to Harford Community College and Harford County, despite the fact that the relevant statutes authorized a grant to the subdivision alone. This brought the State and County financial contributions to the project to more than $3.5 million.

that letter. Shortly thereafter, there was a change of administration in the County. The competing claims of "ownership" of the building by the County and HCC remain unresolved.

## II

## Legal Analysis

There is apparently no dispute that the Transportation Authority owns the land on which the academic building is located. Nor does there appear to be any question that, with the Transportation Authority's assent, the County constructed the academic building, had control over it, and was entitled to any income derived from it – in short, the County owned the building. The sole question is whether the County conveyed its interest in the building to HCC.

We understand that HCC claims ownership of the academic building on the basis of the November 9, 1993 letter of the former County Executive. That letter purported to assign use and "ownership" of the facility for so long as the mission of the HEAT Center was carried out in accordance with the April 1993 Memorandum of Understanding. It could also be argued that, on the basis of this letter and the County's apparent past acquiescence in HCC's control of the facility, the County is estopped from denying HCC an ownership interest in the building.

The County argues that the assignment was unauthorized, lacked consideration, and was never formally executed. Moreover, the County alleges that HCC has not satisfied a condition of the assignment because it has failed to adhere to certain provisions of the April 1993 Memorandum of Understanding.

We need not resolve all of these contentions, because, in our opinion, any attempt in the November 9, 1993 letter to convey the County's ownership interest in the academic building to HCC would have violated both County and State law.

Whether the purported November 1993 transfer of ownership of the academic building to HCC is regarded as a legal, equitable, or gratuitous assignment, it could not be made contrary to law.[5] *See Sears v. Ogden City*, 533 P.2d 118, 119 (Utah 1975) (city could not make gift of street to board of education because "[t]he property owned by a city is held by the city in trust for the use and benefit of its inhabitants and cannot be disposed of by gift without specific legislative authority"); Restatement 2d Contracts §331, *Comment a*

---

[5]We need not decide whether the fact that the facility had not yet been built would invalidate a transfer of ownership as the assignment of a right not yet in existence. *See* Restatement 2d Contracts §331, *Comment b*; and 6 Am. Jur. 2d *Assignments* §15.

("assignment may be voidable for fraud or other invalidating cause"); 6 Am.Jur.2d *Assignments* at §8 ("only those assignments that are not contrary to express law...are valid") In a similar vein, an "estoppel cannot make lawful a municipal action which is beyond the scope of its power to act." *Inlet Associates v. Assateague House*, 313 Md. 413, 437, 545 A.2d 1296 (1988). In our view, the purported assignment to HCC of ownership rights in the HEAT academic facility runs afoul of these principles for two reasons.

First, the Harford County Code restricts the authority of the County Executive to "sell, transfer, exchange, or otherwise dispose of any real property, or any improvements thereon." Harford Co. Code, §1-29B. Among the conditions imposed by this ordinance are notice to the County Council, advertised public hearings, and a Council vote on whether the property is surplus or needed.[6] *Id*. Transfers to other governmental units for less than the appraised value of the property must be authorized by the County Council. §1-29D. Apparently, none of these procedures were followed prior to the November 1993 letter assignment of the HEAT academic building to HCC. Thus, because the transfer would have been contrary to law, any assignment made in the November 1993 letter is invalid, and the County could not be estopped from asserting its invalidity.

Second, the agreements with State agencies that supported the construction of the HEAT Center academic building clearly contemplate the County as owner of the facility. It was implicit in the 1990 State bond bill that authorized State funds for construction and equipping of the facility, as well as in the Capital Projects Grant Agreement between the County and the Board of Public Works, that the County would own the building. This assumption was made explicit in the June 18, 1993 Equity Agreement between the County and the Transportation Authority which recited that the County would "have full control over and use of" the academic facility parcel. The Equity Agreement also provided that the County would have "the full benefit of any lease, rental, or other income derived from the development" of the parcel.

Moreover, Article IV, §1, of the BPW Capital Projects Grant Agreement provided that the County could not "transfer or dispose of ... real or personal property, acquired with Grant funds," unless the BPW approved. This condition prevented the transfer of the HEAT academic building by the County to another governmental body in November 1993 without BPW approval. The building was the subject of the State grant and was designed and constructed with significant public funds. The effect of an assignment would have been to

---

[6]The ordinance contains an exemption from these procedures for "[d]ispositions made in accordance with the conditions upon which the county received the property in the original grant." Harford Co. Code, §1-29F(2). As noted above, under the County's agreement with the Transportation Authority, it constructed the academic building on the understanding that it would have ownership of the building; that agreement does not contemplate a transfer to HCC.

transfer title in the building from an entity with taxing authority and continuing financial responsibilities for the project ) the County ) to one without such power and responsibility ) HCC. Even in the absence of an anti-assignment clause, public policy might well invalidate such an assignment. *See* 63C Am. Jur. 2d *Property* §35 ("a right in property implies the legal power to convey that right as the holder desires, so long as the conveyance neither interferes with the existing rights of others nor violates public policy").

## III

### Conclusion

In our opinion, the County retains its ownership interest in the HEAT academic building because the purported November 1993 assignment of ownership to HCC was invalid.

J. Joseph Curran, Jr.
*Attorney General*

Robert A. Zarnoch
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
  *Opinions & Advice*